Court will proceed to the last case of the day, United States v. Gregory. Mr. Cook. Good afternoon. My name is Frank Cook. I represent the defendant, Shannon Gregory. I was appointed to represent him at the trial level. I was with him on the first time it came here. I was with him when it went back to the trial level, and now I'm here again. This case, of course, arises from my client's betrayal by his brother, Scott. We didn't know that the last time we were here because the government hadn't disclosed who their informant was in this case. All we knew about where the government got their information back then was that some person identified only as being anonymous and anxious to remain anonymous came in to visit Chris Washburn, a Helvedere police officer assigned to the DEA in Rockford, and share with him some information about somebody he knew who was having a marijuana grow operation in rural Pawpaw, Illinois. He brought with him some photos taken with a cell phone, and that impressed Agent Washburn enough that he communicated with another agent down around Sterling and told him to maybe expect a call from this anonymous person who came in. That eventually happened, and we know that from the no-knock complaint warrant, or no-knock blainful warrant that Agent Shavira filed in this case. In that warrant, we felt, back then, that it was totally inadequate in terms of providing the corroboration of incriminating details that is required when you're dealing with an anonymous informant, and the complaint couldn't have been clearer that this was a completely anonymous informant. According to Shavira, he didn't ask his name, didn't know who it was, he just got the information from him. So there was no, when it came time to corroborate the information that he had been provided, about the greatest corroboration was actually the photos that were taken inside the residence here. They at least confirmed or would corroborate that there was some sort of a drug operation going on. The problem with the photos, however, was that they neither demonstrated when or where those photos would have been taken, and Agent Shavira made no effort to corroborate that the photos were in fact taken inside the residence of my client, Shannon Gregory, or others associated with this. And in fact, there were no photos taken in the residence of the other defendant, Donald Cipro. The other thing, and when you look beyond the photos, the efforts by Agent Shavira to corroborate anything was very limited. He discovered, he did a criminal history on my guy, and discovered that he had a conviction for, described as a dangerous drug, possession of a dangerous drug, and that drug happened to be marijuana. No indication of when that conviction occurred in relation to the current time, and nothing beyond that. He said that he took a photo of the outside of the house and showed cars similar to what the informant had told him that these people were driving. Simply no incriminating facts were ever corroborated by ... The same thing true in Illinois against Gates. There's no incriminating facts, but he had an anonymous tip, some corroboration of some innocent facts, but that were consistent with the detailed tip that was given. Well, I think that's true, Your Honor, but some of those things also were like, I believe the tip in Gates talked about the person's going to be leaving at a certain time, he's going to be down in Florida for a certain amount of time, he's going to come back. None of that going on here. I mean, there was no indication about the best he was able to get out of ... And that only came from the informant was, oh, these guys like to sit around and drink and smoke pot all day long. Well, it's also, I mean, we're talking here about a grow operation rather than movement back and forth, as in the Gates case, right? Right. But, I mean, that doesn't mean ... It seems to me, for example, in terms of where the photo was taken, it wouldn't have been that difficult, and I don't know that it would have compromised the investigation at all for the officer to have contacted the landlord. It was a rental property, and to have the landlord say, is this picture from inside the house? Or find a former tenant of the thing and ask him to say, is this picture from within the house? There's no ... It just seems like every ... They made no effort to do any controlled buys. They had a lot of information, supposedly, about the activities that were going on here, and they didn't do much at all to corroborate any of it. The other ... It seems to me the other kind of pertinent fact that Shavira included in the affidavit had to do with the electrical usage at the home, and they had subpoenaed ... He had requested records from Exelon with regard to the electrical usage of my client, and he compared that with a statewide average and said, oh, it's dramatically higher, and that's common for indoor grow operations, and sold that to the judge. Now, we felt that was inadequate, too, because the comparison to a statewide average is fairly meaningless unless a house that my client was in is consistent with what the average house in Illinois is. There's 9 million houses that went into that, single-family residences that went into that average, and I think it was incumbent upon Shavira to indicate that that was a valid comparison. Now ... Counsel, I understand the arguments you're making, I think. Probable cause was not at all overwhelming here at best. How is this ... How do you avoid Leon and a good-faith reliance on the warrant? Well, to me, the problem with that, Your Honor, is the information that, particularly on the electrical usage aspect, Shavira indicated during the Franks hearing we had that he typically would get comparable usage from comparable houses. He claims he didn't ... He has an oversight in this case that he hadn't done that. And you got findings against your clients on the Franks hearing, right? Right. So were those clearly erroneous? I think so, Your Honor. I think when you have an officer indicate that, basically, I always do this, I know that comparable electrical usage numbers are needed for these cases. There's a better way to do it, right? And he said, well, I discovered that we hadn't done it, it was an oversight, and we just decided to go ahead and ask. We felt we could sell it to the judge anyway. Now that, to me, comes awfully close to this officer saying that we thought we could fool that judge who issued this warrant. Was the testimony we thought we could sell it to the judge? No. It's a bit of an embellishment, but it was that we felt that the judge would still go along with this. And the other thing having to do with good faith is the fact that we can tell from the data that came with photos that they were taken at a date different from when the officers represented them to the court. And the government has never really offered any dispute about whether the dates on the photos are accurate. And so we have this situation where in the affidavit they're saying, oh, this guy told us that Scott told us that he got his photos in late December, but we know from looking at the data related to the photos that they were taken in November. So now the officers, of course, say, well, we didn't notice that information. But clearly they manipulated the files on any number of occasions. They provided us the files. We got the data from the files they provided us. It wasn't that information about when those photographs were taken was no secret to anybody who's been around a computer at all. And I believe these officers have been because they took an abundance of digital photos of the search they conducted. Okay. Thank you. Thank you, Mr. Cook. Thank you, Mr. Byrd. Your Honors, Counsel, good afternoon. May it please the Court. My name is Mark Byrd, and I represent the co-appellant in this case, one of the co-appellants, Donald Cipra. Your Honors, in addition to adopting all of the arguments that were made both in the first appeal as well as in brief in this case, there are just a couple of issues I'd like to touch on that I believe further weakens the probable cause analysis when viewing Mr. Cipra's particular case at 1025 Paw Paw Road. The informant in this case, consistent with the affidavit, never indicated to the officers, nor was it represented to the judge, that he had ever actually been inside my client's residence. And I believe that becomes important in evaluating the photographs as well as giving my client his own independent day in court on these probable cause issues because it was, in fact, a separate residence. No indication that he, the confidential informant, Mr. Gregory's brother, had ever been in my client's residence or that he, if he had been, when he had last been in there. And again, none of the photographs were taken from inside his residence. In short, these become important because it's even less probable cause, and I believe that the police agencies in this case are, in effect, trying to somewhat bootstrap the probable cause that they offered on behalf of the defendant. Is that argument in the brief? I believe it was, Your Honor, and certainly it was also in the first brief that we, when we were before the court previously on the case, that I believe there are several references in there indicating that Mr. Gregory, that being Scott Gregory, had never indicated that he had been in 1020. I was looking, in essence, for an argument. I know our court tries to have people file joint briefs, but it does seem to me that there's at least an arguable difference between Sippers' and Gregory's positions here. To some degree. And I'm looking for that. We have unity on all the points, but Mr. Sipper is somewhat distinct in those two regards that I believe weakens the probable cause for him. And, Your Honor, all I would say on the Leon issue is that we have very suspicious facts regarding the failure to seek comparables by Detective or Agent Shavira, who was, in fact, tasked by the DEA with going out and getting the different residences so that they could go into the DEA subpoena seeking comparables. It was admittedly his own practice to seek comparables, but in this case there was an oversight. And finally, on the issue of the dates on the photographs, these officers are working with the FBI. This is discovery that was prepared by them, tendered to the U.S. Attorney's Office, and provided to us. And there was some waffling by both Agent Washburn and Officer Shavira on whether or not they had seen the directories, what the directories said. Initially, I believe Agent Shavira said that when you open it up you do see these directories indicating that they're JPEG photos. And all you have to do, and we believe they very well may have done it, is open those because, again, given the findings by the district court, what do we do with that? Judge, I think in looking at the issue in the district court boiled down to credibility. The officers were credible, Mr. Gregory was not. However, we believe that the district court clearly erred in not taking into account the fact that the officers themselves have a reason to color their testimony in this case. Their departments receive 20% of the assets that are seized and forfeited in these types of cases. Number two, if Mr. Gregory was lying, would he have focused his lie only on the dates and the photographs, or would he have come in and said, oh, they lied in the affidavit about this, they lied in it about that? Instead, he focused on the issue of staleness. An untrained, non-legal person off of the street focused on staleness, which seems to be somewhat consistent with the agents, in this case, Shavira, abandoning the DEA subpoena seeking comparables and deciding to go rogue on his own and just compare these residences, these two residents, against a vague, undefined statistic about average kilowatt usage in all residences in the state of Illinois. For those reasons, Judge, I believe that the credibility issue, the credibility of Mr. Gregory was not given enough weight. For Leon to apply, there has to be a good faith belief by the officers. I believe in this case we established a possibility, at the very least, a likelihood, in the light most favorable to us, that these officers decided, as Mr. Cook phrased it, and I believe the testimony was, to let's run this by the judge, and we think maybe she'll go ahead and take it, rather than doing the corroboration that Glover, Korth, Peck, and Bell require in the probable cause analysis. Was Mr. Cipra on the utility account for both 1025 and 27? I don't recall, Judge. I believe that he was on the one for 1025. He may have been on the one for 1027. However, again, it was a separate residence, and the independent corroboration of legal innocuous types of behavior that was conducted by the officers suggested that 1027 was clearly Mr. Gregory's. For those reasons, Your Honors, we believe that the district court clearly erred, and we're asking the court to reverse Judge Reinhard on his finding that there was, in fact, probable cause. Thank you. Mr. Fuller. May it please the court. The district court properly found that there was probable cause here to support these search warrant affidavits. The anonymous informant had reported firsthand knowledge of the GRO operations in the two residences. That information was detailed. It was internally consistent with what a GRO operation would consist of. The informant reported to Officer Chavira that the going price, in other words, he knew information about the GRO operation that was consistent with Officer Chavira's knowledge about the going price of a pound of marijuana. That information was timely because, according to the informant, that the GRO operation was a consistent, ongoing, continuous operation, and the officers corroborated the informant's information as best they could. They corroborated that, in fact, Gregory and Sipper lived at these residences. They corroborated that each of them had prior marijuana arrests. They corroborated that each of them had firearm owner's identification cards that would enable them to purchase or possess firearms in the state of Illinois, as described by the informant. They corroborated the vehicles that the informant described the defendants using. And also they corroborated the information provided about the electricity account at each of the two houses. The informant had photographs of the GRO operation. So the district court, first of all the issuing magistrate, and later the district court, properly found that there was probable cause to support the search warrants here. Certainly, at the very least, there was a good-faith basis for the application of Leon if, in fact, it was later determined that the search warrants were somehow invalid. The allegations made by the defense attorney, namely as to the photographs and the information contained in the directories on the photographs, as well as the allegation concerning the electricity usage, were fully ventilated in the district court. The district court had a hearing about that, took testimony, and ultimately determined that the officer's testimony was credible, that they did not know the information contained in the photograph directories. What they relied on and what they knew was what the informant had told them, that the photos had been taken the week before Christmas in December 2010. As far as the electricity usage, the district court fully credited Officer Chavira's testimony that his failure to include the comparable electrical usage figures in the affidavit was simply an oversight on his part. Negligence on the part of an officer applying for a search warrant is not a ground for failure to afford the protection of Leon. For these reasons, we ask that the ruling of the district court be affirmed and these convictions and sentences be upheld. Thank you. Mr. Cook, you had reserved a minute. Your time had expired, but you may have that minute. Thank you. Very briefly, as far as the argument about there was a lot of discussion at the trial level about whether the officers should have noticed the directories and the information in the directories and so forth. And Judge Reinhart kind of bought into that. Well, it's unclear whether they would have even noticed this. The fact of the matter is, though, that Agent Washburn testified that he looked at what he had been provided by Scott Greger and he noticed there were a number of JPEG files. Well, the way he knew that was he saw the data related to those particular digital files. The JPEG is a file extension, and right next to that in the directory, you're going to see something that says the date that that file was created. So obviously Washburn had seen a directory. As far as the electrical use is concerned, I mentioned in our brief the Gifford case out of the First Circuit, and we feel that's very comparable to what's going on here. And in Gifford, they found that warrants should be suppressed when the officer failed to advise the issuing judge that he had a comparable or that one of his comparables was from a house one-third the size of the target residence. Here, the comparables were nine million houses in Illinois. Thank you. Thank you, Mr. Cook. Thanks to all counsel. The case is taken under advisement. Mr. Cook, you were appointed in this case. Yes. And you have the additional thanks of the court for accepting the appointment. Thank you. The case is under review.